NOT SCHEDULED FOR ORAL ARGUMENT

**IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT**

| | | |
|---|---|---|
| UTAH PETROLEUM ASSOCIATION, | ) ) ) | |
| *Petitioner*, | ) ) | |
| v. | ) ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., | ) ) ) | Case No. 25-9507 |
| *Respondents,* | ) ) | |
| and | ) ) | |
| CENTER FOR BIOLOGICAL DIVERSITY, et al., | ) ) ) | |
| *Intervenor-Respondents.* | ) ) ) | |

| | | |
|---|---|---|
| STATE OF UTAH, | ) ) ) | |
| *Petitioner*, | ) ) | |
| v. | ) ) | |
| UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, et al., | ) ) ) | Case No. 25-9508 |
| *Respondents,* | ) ) | |
| and | ) ) ) | |

CENTER FOR BIOLOGICAL
DIVERSITY, et al.,

      *Intervenor-Respondents.*

)
)
)
)

**PUBLIC INTEREST GROUPS' OPPOSITION TO
THE MOTIONS TO STAY THE FINAL RULE**

The Uinta Basin has suffered from ozone pollution that chronically exceeds health-based ozone National Ambient Air Quality Standards ("NAAQS") for over a decade.

Petitioners the State of Utah ("Utah") and the Utah Petroleum Association ("UPA") attempt to cherry-pick air monitoring data to paint a different picture. Relying on this nonrepresentative data, they assert that Respondent United States Environmental Protection Agency's ("EPA") determination that the Uinta Basin failed to attain the ozone NAAQS should be stayed, and the effective requirements of the Clean Air Act ("Act") should no longer apply to protect public health and the environment from the pernicious effects of excess ozone.

Monitoring data, however, continues to prove EPA's decision right: the Basin remains in chronic nonattainment. Utah and UPA are unlikely to succeed on the merits, because EPA already used its expertise to thoroughly evaluate and reject their contentions in the rule on appeal, 89 Fed. Reg. 101,483 (Dec. 16, 2024) ("Rule"). The Clean Air Act's plain language clearly provides EPA with discretion

to deny an extension request.  Utah and UPA also fail to meet the high bar of demonstrating irreparable harm.

On the other hand, Intervenor-Respondents Center for Biological Diversity, Utah Physicians for a Healthy Environment, and Living Rivers (together, "the Public Interest Groups"); their members; and the public interest will be irreparably harmed by a stay that postpones the relief from excess ozone pollution they are entitled to under the Clean Air Act.

The Court should deny the motions to stay.  No. 25-9507, Dkt. No. 10 ("UPA Mot.") & Dkt. No. 9 ("Utah Mot.").[1]

## STATEMENT OF THE CASE

### I.    Legal Framework

The Clean Air Act requires EPA to establish NAAQS for a specific set of harmful pollutants.  42 U.S.C. §§ 7408, 7409.  The NAAQS must be set at the level that protects public health with an adequate margin of safety.  *Id*. §§ 7409(b)(1) & (2), 7410.

Ozone is one of the six dangerous and widespread pollutants for which there are NAAQS.  40 C.F.R. § 50.19.

---

[1] The Public Interest Groups are filing an identical opposition in both Case Nos. 25-9507 and 25-9508.

After EPA promulgates or revises a NAAQS, it must identify which areas of the country are not complying with the standard ("nonattainment areas") and which are ("attainment areas").  42 U.S.C. § 7407(d).  EPA and states rely on a nationwide network of air monitoring stations to determine ozone levels.  42 U.S.C. § 7619.

Under the Act, states initially formulate pollution control strategies through State Implementation Plans ("SIPs") to achieve NAAQS compliance.  *Id*. § 7407(a).  Once approved by the EPA, a SIP has "the force and effect of federal law."  *Utah Physicians for a Healthy Env't v. Diesel Power Gear, LLC*, 21 F.4th 1229, 1237 (10th Cir. 2021).

For nonattainment areas like the Uinta Basin, the Act imposes a deadline for the area to comply with the NAAQS.  *Id*. §§ 7502(a)(2), 7511(a)(1).  Ozone nonattainment areas can be classified as marginal, moderate, serious, severe, or extreme, with attainment dates that correspond to each classification that range from three to twenty years after the areas were first designated as nonattainment.  *Id*. § 7511(a)(1).  Marginal areas must attain within three years of the initial nonattainment designation.  *Id*.

The Act provides EPA with discretion to extend the attainment date two times, at most.  EPA has discretion to grant or deny an extension if two statutory criteria are met.  42 U.S.C. § 7511(a)(5) ("Upon application by any State, the

Administrator **may extend** for 1 additional year [the attainment date]." (emphasis added)).

No later than six months after an area's attainment deadline, whether it was extended or not, EPA must determine whether the area successfully attained the NAAQS. *Id*. § 7511(b)(2)(A). Each time EPA determines that a nonattainment area failed to attain the ozone NAAQS by its attainment deadline, the area is reclassified by operation of law to a worse classification (*e.g.*, from "marginal" to "moderate"). *Id*.

Because the state's prior SIP failed to achieve attainment of the NAAQS in this circumstance, the state must submit a new SIP with stricter pollution requirements to EPA for approval. *Id*. §§ 7502, 7503, 7511a.

Marginal nonattainment areas are subject to significantly weaker pollution control requirements than moderate areas. 42 U.S.C. § 7511a(a), (b). That is because most of the Act's most effective requirements for nonattainment areas only kick in with a moderate (or worse) classification.[2] *Id*.

---

[2] These additional requirements include, *e.g.*, stronger permitting rules; emissions limits on certain sources of pollution; and a requirement that sources offset their new pollution by reducing pollution from other sources. 42 U.S.C. § 7511a(b)(1)–(5).

5

## II.    Factual Background

### A.    Harms of ozone

Ozone is a dangerous air pollutant that attacks the lungs and other parts of the body, contributing to respiratory problems, cardiovascular issues, and premature deaths.  *See* 80 Fed. Reg. 65,292, 65,302–17 (Oct. 26, 2015).  The evidence also suggests a causal relationship between ozone exposure and adverse reproductive and developmental effects, including adverse birth outcomes.  *Id*. at 65,338.  Children, the elderly, people with respiratory conditions like asthma, and people who work or recreate outdoors are most at risk from ozone.  *See id*. at 65,322.

Ozone also damages commercial crops and other vegetation, harming the environment and economy.  *Id*. at 65,372–73, 65,377–78.

### B.    Uinta Basin's nonattainment history

In 2015, EPA tightened the ozone NAAQS to a level of 70 parts per billion ("ppb") to protect public health and welfare.  80 Fed. Reg. at 65,292.  The standards provide that attainment of the 70 ppb level is determined based on the last three full years of ozone monitoring data.  40 C.F.R. § 50.19(b).  For example, whether or not an area attained by the original marginal attainment date of August 3, 2021, is based on monitoring data from 2018, 2019, and 2020.

EPA then designated the Uinta Basin as a "marginal" nonattainment area for the 2015 ozone NAAQS, because the area has ozone levels that violate the NAAQS.  83 Fed. Reg. 25,776 (June 4, 2018).

Utah failed to bring Uinta Basin air quality into compliance with the NAAQS by the original marginal attainment date of August 3, 2021.  87 Fed. Reg. 60,897 (Oct. 7, 2022).  EPA, however, granted the area a one-year extension of the marginal deadline, postponing it until August 3, 2022.  *Id*.

Utah also failed to bring down ozone below the health-based standard by this extended attainment date, so the state requested a second one-year extension. Rule at 101,484.  This extension—the one EPA denied in the Rule—would have extended the attainment date to August 3, 2023.  *Id*.

Granting the extension would allow Utah to claim it attained by the extended deadline.  Attainment by this date would be based on the 2020–2022 dataset, which, as shown in the table below, is the one dataset of the last twelve that shows the area attained—the only dataset showing attainment since monitoring for the 2015 NAAQS began.  The extension would have allowed Utah and UPA to take advantage of this outlier dataset.

The three subsequent datasets—2021–2023, 2022–2024, and 2023–2025—all show ozone NAAQS violations.  The Uinta Basin's chronic history of failing to attain the 70 ppb ozone NAAQS is shown below:[3]

| Data years | Ozone design value (parts per billion) |
|:---:|:---:|
| 2012-2014 | 94 |
| 2013-2015 | 93 |
| 2014-2016 | 81 |
| 2015-2017 | 89 |
| 2016-2018 | 88 |
| 2017-2019 | 89 |
| 2018-2020 | 76 |
| 2019-2021 | 78 |
| 2020-2022 | 67 |
| 2021-2023 | 77 |
| 2022-2024 | 76 |
| 2023-2025[4] | 71 |

Nonattainment has remained the norm in the Uinta Basin since monitoring for the 2015 ozone NAAQS began.

---

[3] Neither Utah nor UPA dispute this data, which Utah collects.  *See* EPA, Response to Comments, Dkt. No. EPA-R08-OAR-2024-0001, at 10 (Dec. 2024) (Exhibit 1) ("Response to Comments").

[4] There is only preliminary data for 2025, but it still shows a violation for the 2023–2025 dataset.  EPA, Monitor Values Report (last updated Mar. 28, 2025), https://www.epa.gov/outdoor-air-quality-data/monitor-values-report.

Utah and EPA have determined that oil and gas production in the Uinta Basin drives ozone nonattainment. Utah Department of Environmental Quality ("DEQ"), Uinta Basin Ozone Studies (updated Oct. 6, 2023)[5]; 89 Fed. Reg. 25,223, 25,227 (Apr. 10, 2024). Oil and gas production is expanding rapidly in the Basin; 2024 oil production was nearly double 2019 production. U.S. Energy Information Administration, Utah Field Production of Crude Oil (released Apr. 30, 2025).[6] This will continue to put upward pressure on ozone-causing emissions. *See* Utah DEQ, Ozone in the Uinta Basin (updated Apr. 9, 2025) ("Increased oil and gas development in the Uinta Basin have led to environmental issues regarding air quality . . .").[7]

In the Rule, EPA had a rational basis for taking these factors into account, denied the extension that would allow Utah to take advantage of the one nonrepresentative dataset, and determined the Uinta Basin should be bumped up to a moderate classification. EPA determined, *inter alia*, that external factors, like the Basin's weather, rather than Utah's SIP, determine whether the area will violate, when the SIP is required to maintain air quality below the NAAQS regardless of external factors. *See* Rule at 101,485–86; Response to Comments at 11–13.

---

[5] *Available at* https://deq.utah.gov/air-quality/uinta-basin-ozone-studies-ubos.
[6] *Available at* https://www.eia.gov/dnav/pet/hist/LeafHandler.ashx?n=pet&s=mcrfput1&f=a.
[7] *Available at* https://deq.utah.gov/air-quality/ozone-in-the-uinta-basin.

## ARGUMENT

To secure a stay under Tenth Circuit Rule 18.1, applicants must address the following factors: (1) the likelihood of success on appeal; (2) irreparable injury if relief is withheld; (3) the absence of harm to opposing parties if the stay is granted; and (4) any risk of harm to the public interest.  10th Cir. R. 18.1 (incorporating 10th Cir. R. 8.1); *Nken v. Holder*, 556 U.S. 418, 434 (2009).  Movants fail on all four factors.

Further, the "less stringent" requirement for proving the likelihood of success on the merits to which Utah refers only applies if the movant "can establish that the latter three requirements tip strongly in his favor."  Utah Mot. at 13; *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002).  Utah and UPA have not made this showing; the modified test from *Davis* does not apply.

## I.     Utah and UPA are unlikely to prevail on the merits.

The Act's judicial review provision does not provide a standard for reviewing EPA decisions on extensions.  42 U.S.C. § 7607(b)(1).  The Administrative Procedure Act standard applies.  *U.S. Magnesium, LLC v. EPA*, 690 F.3d 1157, 1164 (10th Cir. 2012).

Under this standard, the Court "will not set aside agency action unless it is procedurally defective, arbitrary or capricious in substance, or manifestly contrary

to the statute." *Ariz. Pub. Serv. Co. v. EPA*, 562 F.3d 1116, 1122 (10th Cir. 2009).

The Court's inquiry is "searching and careful, [but] our review is ultimately a

narrow one." *U.S. Magnesium*, 690 F.3d at 1164 (quoting *Maier v. EPA*, 114 F.3d

1032, 1039 (10th Cir. 1997)).

### A.     EPA has discretion to deny an extension based on chronic nonattainment even if the two minimum statutory criteria are met.

The Act provides that EPA "may extend" the attainment date if (A) the State

is meeting all SIP requirements and (B) "no more than 1 exceedance of the

[NAAQS] level for ozone has occurred in the area in the year preceding the

Extension Year." 42 U.S.C. § 7511(a)(5)(A)–(B). "The clearest case of discretion

is when an agency doesn't have to act—for instance if a statute says 'may' rather

than 'must' or 'shall.'" *NRDC v. McCarthy*, 993 F.3d 1243, 1253 (10th Cir. 2021)

(citations omitted and cleaned up).

UPA argues that because the second minimum statutory criteria for an

extension involves assessing ozone exceedances, EPA is barred from evaluating

additional air monitoring data when making an extension determination. UPA

Mot. at 13–16.

This interpretation, however, impermissibly and absurdly converts the

second minimum statutory criteria into a mandatory trigger. *See, e.g., New York v.*

11

*EPA*, 921 F.3d 257, 298 (D.C. Cir. 2019) (internal citations omitted) (finding under a similarly constructed CAA provision that "[t]he statute requires this showing to be made, but once it has been made, the statute provides only that EPA 'may' expand the region, not that it 'shall' or 'must' do so . . . . In other words, this requirement is a necessary but not sufficient condition for expansion of the region.").

The D.C. Circuit has acknowledged that Section 181(a)(5) grants the EPA discretion to look beyond the two enumerated factors.  *Delaware Dep't of Nat. Resources v. EPA*, 895 F.3d 90, 100 (D.C. Cir. 2018) (noting that, despite its holding that the EPA was not required to determine every state in a multi-state nonattainment area's compliance with its SIP under section 181(a)(5)(A), "EPA nevertheless retained discretion to consider Delaware's compliance, given that the Act only dictates that EPA 'may' grant an extension when the statute's requirements are met").

The court added that the EPA's exercise of discretion under this provision is subject to arbitrary-and-capricious review, such that the agency can look beyond the two criteria but "must cogently explain why it has exercised its discretion in a given manner." *Id*. (citing *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Auto. Ins. Co*., 463 U.S. 29, 48 (1983)).  Here, EPA has explained itself, and its decision is supported by the record.

Further, EPA's regulations do not require the agency to ignore additional air data. EPA is owed deference in interpreting its own regulations in this context. *Kisor v. Wilkie*, 588 U.S. 558 (2019).

To the contrary, courts have determined that EPA must look at the "best available data" when evaluating nonattainment areas to a fully informed decision. *See, e.g.*, *Board of Cnty. Comm'rs of Weld Cnty. v. EPA*, 72 F.4th 284, 290 (D.C. Cir. 2023); *ATK Launch Sys. v. EPA*, 669 F.3d 330, 337 (D.C. Cir. 2012) (determining "it was appropriate for EPA to consider 'the best available information'" when designating Utah's nonattainment areas).

UPA's interpretation would produce the absurd result of requiring EPA to ignore crucial data and disregard whether a nonattainment area for which an extension is sought is actually violating the ozone NAAQS. As discussed above, attainment is based on the three full years of data that precede the attainment date. The minimum statutory criterion requires EPA to assess a exceedance of the NAAQS in a single year, while EPA's regulations requires averaging of exceedances across two years, 40 C.F.R. § 51.1307(a)(2). Single exceedances in these narrower timeframes (i.e., less than three years) can have very little bearing on whether an area is meeting the NAAQS. Adopting UPA's interpretation would put EPA in the position of evaluating extension requests without being able to consider whether an area is anywhere near attainment.

13

Further, contrary to UPA's representations, UPA Mot. at 14–16, EPA did not rely on 2023's monitoring data and high snowfall alone to deny the extension, even though the agency could have. EPA assessed the long pattern of ozone violations, including the violation shown by the 2021–2023 and 2022–2024 datasets, as well as the preceding ten years of data, to determine that attainment in the 2020 to 2022 period was an aberration. *E.g.*, Rule at 101,485–86; Response to Comments at 8–15. The violation shown by the 2023–2025 data only bolsters EPA's decision.

### B.    EPA appropriately responded to public feedback in the Rule, rather than the standard of its discretionary review.

UPA would have EPA's final rule simply reiterate the contents of its proposed rule, instead of adjusting to public feedback, which is the purpose of notice-and-comment rulemaking. UPA Mot. at 16–17. Rather than moving the goalposts, EPA evaluated and responded to public comment in the Rule.

UPA understood the extension determination is discretionary, which is why its comments on the proposed rule previewed the merits arguments UPA has made before this Court. This includes claiming other pollution measures external to the SIP will achieve attainment; anomalous snow conditions in 2023; and a downward trend in emissions and ozone violations. UPA Comments on EPA's Proposal, at 2–8 (May 10, 2024) (Exhibit 2). Further, UPA urged EPA to consider winter 2024 data, contradicting its argument above that EPA's analysis should be limited to

14

retrospective ozone exceedances. EPA did not "pull a surprise switcheroo," as evinced by UPA's comments. *Envtl. Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005).

UPA and Utah were properly on notice that EPA might deny the extension in the final rule, even where EPA originally proposed to approve the extension.[8] *See Arizona Pub. Serv. Co. v. EPA,* 211 F.3d 1280, 1299 (D.C. Cir. 2000) ("[T]he final rule was not wholly unrelated or surprisingly distant from what EPA initially suggested. In first proposing that Tribes would have to meet the 'same requirements' as states, EPA effectively raised the question as to whether this made sense."); 81 Fed. Reg. 69,396, 69,400 (Oct. 2, 2016) ("Implicit in any such proposal to grant an extension requested by a state is the possibility that the EPA may decide to deny the extension, after considering public comments.").

### C. EPA thoroughly analyzed and rejected Utah and UPA's argument that attainment will result without a moderate classification.

Utah and UPA claim that EPA failed to consider emissions reductions in the Uinta Basin. Utah Mot. at 14–15; UPA Mot. at 20–22. Utah, however, directly

---

[8] Nor can Petitioners prejudge the outcome of EPA's reconsideration process to argue that the Rule should be stayed because EPA will reverse course. EPA, appropriately, has not signaled what the outcome of reconsideration will be.

contradicts itself, acknowledging that EPA's proposed rule "dedicated an entire section to describe these emission reductions and measures." *Id*. at 14.

EPA also provided detailed analysis of the claimed emissions reductions and the pollution control measures when supporting its final decision. *E.g.*, Rule at 101,485–86; Response to Comments at 9 ("And while we think there is reason to believe that the efforts by Federal, State, Tribal, industry, and other partners to control emissions from the oil and gas sector are having positive impacts on monitored air quality, the high ozone levels in 2023 do indicate that ozone in the area is highly variable, and that unhealthy levels remain possible."). EPA rationally determined that the chronic, persisting failure to attain did not warrant further postponement of the extension date.

Relatedly, Utah asserts that EPA did not rationally connect "favorable" air quality trends to the denial of the extension. Utah Mot. at 18–19. EPA, again, engaged in a detailed analysis of the trend in denying the extension. *See, e.g.*, Rule at 101,485–86 ("[I]f EPA were to . . . determine that the area attained by its Marginal area attainment date, the area could continue violating the 2015 ozone NAAQS indefinitely without being subject to any of the CAA's attainment planning requirements and consequences that were designed to ensure that nonattainment areas progress to attainment.").

The Clean Air Act does not hinge on whether air quality is getting less bad—it is concerned with attainment. Ozone in the Uinta Basin is persistently present at levels that harm human health and the environment. As EPA determined, external factors, including the Basin's weather, rather than the SIP, determine whether the area will violate, which is impermissible under the Act. *See* Response to Comments at 11–13 ("air quality planning (including an attainment demonstration) should be performed, and should take the possibility of wintertime snowfall into consideration, so that the agencies can determine the level of emission reductions necessary to attain the standard in this area even in years with meteorological conditions conducive to ozone formation.").

Utah would have this Court substitute its judgment for EPA's expert assessment of a vague trend line that may generally show decreasing ozone values. *State Farm*, 463 U.S. at 43 ("[R]eviewing courts must exercise appropriate deference to agency decisionmaking and not substitute their own judgment for that of the agency.").

### D.    States cannot rely on measures outside of the SIP to achieve attainment.

UPA and Utah contend that the reclassification is not necessary because other measures, outside of the SIP, will protect air quality during the stay. Utah Mot. at 14; UPA Mot. at 20. EPA found the opposite, determining that the

reclassification was necessary because otherwise "the area could continue violating the 2015 ozone NAAQS indefinitely without being subject to any of the CAA's attainment planning requirements and consequences that were designed to ensure that nonattainment areas progress to attainment." *Id*. at 101,485–86.

States cannot rely on federal, state, or voluntary measures that are external to the SIP to achieve attainment. "[T]he language and structure of the CAA demand that all control measures on which the Plans rely to attain the NAAQS be included in the SIP and subject to enforcement by individuals and by EPA . . . ." *Comm. for a Better Arvin v. EPA*, 786 F.3d 1169, 1175 (9th Cir. 2015). The SIP itself must achieve attainment.

This is because pollution control requirements external to the SIP can change at any time, without regard for whether that will perpetuate a nonattainment problem in a specific area. Nor are these requirements specifically designed to achieve attainment in any given area, like a SIP must be.

This problem is demonstrated by recent events. The "key federal rules" that UPA and Utah would have the public rely on instead of the SIP are currently under reconsideration. UPA Opp. at 15–16; Utah Opp. at 14–15. EPA has now taken an adverse position on these regulations and announced their rollback as part of the

"the greatest and most consequential day of deregulation in the history of the United States."[9]

Utah itself filed a federal appeal challenging another of these key federal rules, a fee on excessive methane emissions from oil and gas sources required by the Inflation Reduction Act.  *State of Texas, et al., v. EPA, et al.*, No. 25-1022 (D.C. Cir. 2025), *see* Petition for Review, ECF#2094481.  This rule has since been eliminated by Congress pursuant to the Congressional Review Act.  Joint Resolution of March 14, 2025, Pub. L. No. 119-2, 139 Stat. 7.  Utah is challenging key federal rules while simultaneously claiming they can be relied upon to drive attainment in the Unita Basin, instead of the SIP.  They cannot have it both ways.

## II.    Utah and UPA will not suffer irreparable harm without a stay.

Movants for a stay face a "high bar" for irreparable injury.  *NM Dep't of Game & Fish v. DOI*, 854 F.3d 1236, 1251 (10th Cir. 2017).  To constitute irreparable harm, an injury must be "imminent," as well as "certain, great, actual and not theoretical."  *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003).

---

[9] Press Release, EPA, *Trump EPA Announces OOOO b/c Reconsideration of Biden-Harris Rules Strangling American Energy Producers* (Mar. 12, 2025), https://www.epa.gov/newsreleases/trump-epa-announces-oooo-bc-reconsideration-biden-harris-rules-strangling-american.

As an initial matter, most of the harms Petitioners allege will result without a stay pertain to a theoretical future reclassification of the Uinta Basin to "serious" nonattainment.  UPA Mot. at 23–25; Utah Mot. at 19–24.  But the Rule reclassifies the Basin to "moderate," not serious, nonattainment.  Rule at 101,483.

Reclassification to serious nonattainment would be the result of an entirely separate rulemaking.  *See, e.g.*, 89 Fed. Reg. 97,545 (Dec. 9, 2024).  Petitioners will have the opportunity to participate in such a rulemaking and a subsequent appeal, and to seek a stay therein, meaning these injuries are not imminent.

Also, a reclassification to serious may not occur, or may be significantly delayed.  This Court, for example, very recently stayed the reclassification of Utah's Northern Wasatch Front ozone nonattainment to serious.  *State of Utah v. EPA, et al.*, No. 25-9519, Dkt. No. 20 (Apr. 30, 2025).  Utah could also voluntarily reclassify the Uinta Basin to severe nonattainment, which would postpone the Basin's attainment date by several years.  42 U.S.C. § 7511(b)(3).  Utah and EPA have also signaled their intent to attempt to attribute Utah's high ozone pollution to international emissions, which would obviate the serious reclassification.  42 U.S.C. § 7509a.

Accordingly, Utah's assertion that 52 sources of pollution will become subject to Title V permitting requirements is speculation, because it is contingent upon EPA reclassifying the Basin to serious and that determination taking effect.

20

Utah Mot. at 22.  Utah and UPA fail to identify any pollution sources that are newly subject to Title V requirements because of the Rule, and they cannot; the bump up to moderate does not change the Title V applicability requirements.  42 U.S.C. § 7602(j).

With respect to offsetting requirements, Petitioners again refer to the potential serious reclassification to allege harm.  UPA Mot. to Stay at 24–25; Utah Mot. to Stay at 23.

UPA alleges harm due to Reasonably Available Control Technology ("RACT") and Reasonable Further Progress ("RFP") pollution limits.  42 U.S.C. § 7511a(b)(1), (2).  These limits do not yet exist and only take effect federally after Utah adopts RACT and RFP into its State Implementation Plan ("SIP"), *and* EPA approves of these SIP revisions through notice-and-comment rulemaking, which typically takes multiple years.  *See* Utah Mot. at 20 ("The SIP-writing process is lengthy and involves multiple steps").  These harms are not imminent.

Nor is Utah's alleged administrative burden of developing the moderate SIP. Utah Mot. to Stay at 19–22.  Utah acknowledges that EPA has not even set a deadline for this SIP submission, has authority to adjust regulatory deadlines, and has committed to postponing further action to future rulemaking, which has not yet occurred.  *Id*. at 19 (citing Rule at 101,484, 101,486).

Further, the risk of EPA denying an extension and a state needing to prepare a new SIP as a result of reclassification is borne by the state requesting the extension.  For over 30 years, EPA has taken the position that "marginal areas that request extensions under section 181(a)(5) should document that they have initiated rule development activities in order to meet the Act's requirements associated with the *new* classification."  Memorandum from D. Kent Berry, Acting Director, Procedures for Processing Bump Ups and Extension Requests for Marginal Ozone Nonattainment Areas, at 3 (Feb. 3, 1994) (emphasis added) (Exhibit 3).[10]  This includes "[a] plan to meet the SIP submittals and attainment date required by the higher classification."  *Id*.  Thus, Utah should already have been prepared for the present situation and cannot now tax Utah's public health to pay off its losing bet.

Utah asserts that SIP development costs (presuming full development of the moderate SIP) will amount to $3.9 million.  Utah Mot. at 20–21.  As an initial matter, "purely economic harm . . . generally is insufficient to constitute irreparable harm."  *Lane v. Buckley*, 643 Fed. Appx. 686, 688 (10th Cir. 2016) (citation omitted).

---

[10] *Available at* https://www3.epa.gov/ttn/naaqs/aqmguide/collection/cp2/19940203_berry_attainment_date_extension.pdf.

Utah also does not balance this cost against the public health costs ozone imposes on its residents and government programs. In promulgating the 2015 ozone NAAQS, EPA estimated that the standard would avoid between 96 and 160 premature deaths per year and yield public health benefits of between $2.9 to 5.9 billion per year, with costs less than half of the lower end of this range. EPA, *Regulatory Impact Analysis of the Final Revisions to the NAAQS for Ground-Level Ozone*, at ES-15, ES-16, 6-2 (Sept. 2015).[11] The net benefit nationwide, excluding California, is estimated to be $1.5 to 4.5 billion. *Id.*

Additionally, Utah's estimated SIP development cost of $3.9 million is just 0.4% of total revenue from oil and gas production in Uintah and Duchesne Counties, according to Utah's own declarations. According to these declarations, Uintah and Duchesne Counties brought in $957.89 million dollars from oil and gas production between 2019 and 2023. Norton Decl. ¶ 16; Miles Decl. ¶ 14. This revenue (in millions of dollars) is summarized below:

| Revenue Source | Uintah – Norton | Duchesne - Miles | | |
|---|---|---|---|---|
| Oil and gas severance tax | $137 | $87 | | |
| Sales tax paid on oil and gas inputs | $124 | $76 | | |
| Real property tax | $85 | $75 | | |
| Business personal property tax | $130 | $98 | | |
| Mineral lease royalties | $97 | $49 | | |
| | $573 | $385 | $958M | TOTAL |

---

[11] *Available at* https://www.epa.gov/naaqs/regulatory-impact-analysis-final-revisions-national-ambient-air-quality-standards-ground.

Oil production in the Basin has nearly doubled since 2019 (66 million barrels in 2024 versus 37 million barrels in 2020).[12] Utah's oil and gas revenue is growing, but at the expense of public health.

### III.    The Public Interest Groups and their members will face irreparable harm with a stay.

This Court considers "the absence of harm to opposing parties if the stay is granted." *Baca v. Hickenlooper*, 2016 U.S.App.LEXIS 23391, at *7 (10th Cir. 2016).  Far from an absence of harm, the Public Interest Groups and their members will suffer irreparable harm if the stay is granted.

Staying the Rule will mean that ozone reductions that the Clean Air Act requires will be significantly delayed.  The excess ozone that will result attacks the lungs and other parts of the body, contributing to respiratory problems, cardiovascular issues, and premature deaths.  *See* 80 Fed. Reg. at 65,302–17.  Ozone may also cause adverse birth outcomes.  *Id*. at 65,338.  These consequences can be irreparable.

Further, as the Public Interest Groups have asserted in these appeals, any stay will likely last for years, as will the harms done by the excess ozone it will

---

[12] *Supra* at 9, n.6.

allow.  *See* Public Interest Groups' Reply, at 11–12, No. 25-9507, Dkt. No. 32 (Mar. 21, 2025).

## IV.     A stay will harm the public interest.

A stay will harm the public interest for the same reasons that it will harm the Public Interest Groups: excess ozone pollution will harm public health and the environment.

In reaching its decision, EPA determined that granting the extension "would potentially delay needed improvement of the area's air quality and protection of human health and the environment" and denied the extension "to ensure that communities in the Uinta Basin are not exposed to disproportionate health and environmental impacts."  Rule at 101,485–86.

EPA has already determined that reclassifying the Uinta Basin as moderate is necessary to protect the public interest.  Utah itself has recognized that excess emissions, in violation of what the law requires, "expose[s] the residents of the State of Utah to air pollutants, which . . . has an adverse impact on the health and welfare of the public."  *State of Utah v. Green Natural Gas Ventures, LLC*, Complaint, at 9 (Exhibit 4).

A stay will particularly harm children, the elderly, and those who work and are active outdoors.  80 Fed. Reg. at 65,322.  The Clean Air Act is tremendously

effective if allowed to work as Congress designed. Postponing the benefits it provides will harm the public interest.

## CONCLUSION

For the foregoing reasons, the Court should not stay the Rule.

Respectfully submitted,

/s/ *Ryan Maher*

Ryan Maher
Center for Biological Diversity
1411 K Street NW, Suite 1300
Washington, D.C. 20005
(781) 325-6303
rmaher@biologicaldiversity.org

Wendy Park
Center for Biological Diversity
2100 Franklin St., Suite 375
Oakland, CA 94612
(510) 844-7138
wpark@biologicaldiversity.org

*Counsel for Intervenor-Respondents Center for Biological Diversity, Utah Physicians for a Healthy Environment, and Living Rivers*

DATED: May 12, 2025

**CERTIFICATE OF COMPLIANCE**

In accordance with Federal Rules of Appellate Procedure 32(g)(1) and 27(d)(2)(A), I hereby certify that the foregoing contains 5,178 words, as counted by counsel's word processing system, and thus complies with the 5,200-word limit.

Further, this document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 using 14-point Times New Roman font.

/s/ *Ryan Maher*
Ryan Maher

**CERTIFICATE OF SERVICE**

I hereby certify that on May 12, 2025, I electronically filed the foregoing response in opposition with the Clerk of the Court for the United States Court of Appeals for the Tenth Circuit using the appellate CM/ECF system.  Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

/s/ *Ryan Maher*

Ryan Maher