**Response to Comments on Proposed Extension of the Attainment Date and Determination of Attainment by the Attainment Date of the Uinta Basin Marginal Nonattainment Area under the 2015 Ozone National Ambient Air Quality Standards (EPA-R08-OAR-2024-0001)**

**December 2024**

# Table of Contents

I.   Introduction ............................................................................................................. 3

II.  Comments and Responses.......................................................................................... 4

   A.   Comments Related to the Two Criteria in CAA Section 181(a)(5) ...................................... 4

     A.1.   Eligibility for Requesting a 1-year Extension ............................................................ 4

     A.2.   Compliance with State Implementation Plan ........................................................... 5

   B.   Comments that Would Otherwise Limit EPA's Discretion................................................ 7

     B.1.   Multi-Jurisdictional Nonattainment Area ................................................................ 7

   C.   Comments Related to EPA's Exercise of Discretion............................................................ 8

     C.1.   Regional air quality ................................................................................................... 9

     C.2.   Planning Requirements............................................................................................ 15

     C.4.   Environmental Justice ............................................................................................. 21

## I. Introduction

On April 10, 2024, the U.S. Environmental Protection Agency (EPA) published a notice of proposed rulemaking titled "Extension of the Attainment Date and Determination of Attainment by the Attainment Date of the Uinta Basin (Basin) Marginal Nonattainment Area under the 2015 Ozone National Ambient Air Quality Standards (NAAQS)."[1] If finalized, this proposal would have extended the Marginal area attainment date for this area from August 3, 2022, to August 3, 2023. In addition, the EPA proposed to issue a Determination of Attainment by the Attainment Date, which would have determined that the area attained the 2015 ozone NAAQS by the new extended attainment date of August 3, 2023, based on certified ozone monitoring data from 2020-2022.[2]

The EPA established a public docket for this proposal to ensure that documents and information relevant for support of the proposal would be easily accessible and to support a public notice-and-comment process. In its proposal, the EPA invited the public to participate in the rulemaking process by submitting their written comments on the proposal to docket number EPA-R8-OAR-2024-0001 using www.regulations.gov. The 30-day public review and comment period began on April 10, 2024, the day the notice of proposed rulemaking (NPRM) published, and closed on May 10, 2024. Nine comments were submitted during the public comment period; they are listed in table 1, along with the docket identification number and the identity of the individual or organization that submitted the comment.

**Table 1 - Comments on Proposed Rule (Docket EPA-R8-OAR-2024-0001)**

| Comment Identification Number | Commenter |
|---|---|
| 0008 | Anonymous |
| 0009 | Anonymous |
| 0010 | Anonymous |
| 0011 | Anonymous |
| 0012 | Bryce C. Bird, Director, Division of Air Quality, Utah Department of Environmental Quality (UDAQ) |
| 0013 | Rikki Hrenko-Browning - Utah Petroleum Association (UPA) |
| 0015 | Member of the public – Richard Spotts |
| 0016 | Jeremy Nichols - Center for Biological Diversity (CBD) |
| 0017 | Joro Walker, General Counsel, Western Resource Advocates (WRA) |

The Clean Air Act (CAA) gives the EPA discretion – "the Administrator *may*" – as to whether to extend an ozone nonattainment area's attainment date by one additional year on application by any state, if two criteria are satisfied. CAA section 181(a)(5) (emphasis added). See also 40 CFR 51.1307. The two criteria are:

---

[1] 89 FR 25223 (Apr. 10, 2024).
[2] The extension proposed in April 2024 would have been the second extension granted for the area. In 2021 the State of Utah had requested an initial 1-year extension of the Marginal area attainment date for the Uinta Basin; the Ute Indian Tribe also requested an extension. EPA granted that first extension, making the new attainment date August 3, 2022. 87 FR 60897 (Oct. 7, 2022). On March 29, 2022, the State requested a second one-year extension of the Marginal area attainment date for the Uinta Basin, and on December 20, 2022, the Tribe also requested a second one-year extension.

§ 181(a)(5)(A)   the State has complied with all requirements and commitments pertaining to the area in the applicable implementation plan

§ 181(a)(5)(B)   no more than 1 exceedance of the national ambient air quality standard level for ozone has occurred in the area in the year preceding the Extension Year

The provision allows a maximum of two 1-year extensions for a single area. In the proposed rule, we explained that the information presented by the State showed that the area met the two necessary statutory criteria for a second 1-year extension under CAA section 181(a)(5). As explained in this *Response to Comments* document, that is still our conclusion. But the two specified criteria in section 181(a)(5) are the minimum requirements necessary for EPA to consider an extension request, not a guarantee that EPA will grant such a request. "While EPA cannot grant an extension request if the conditions are not met, it is not required to do so even if they are." 62 FR 60001, 60004 (Nov. 6, 1997). As explained below and in the *Final Rule* that this *Response to Comments* document is associated with, after carefully considering comments received, we have concluded that it is appropriate for EPA to use its discretion to deny the request for a second extension of the Marginal area attainment date. As a result, EPA is determining that the area failed to attain by the first extended attainment date, based on certified ozone monitoring data from 2019-2021. Accordingly, the area is reclassified by operation of law on the effective date of this action to Moderate nonattainment for the 2015 ozone NAAQS.

The EPA's reasoning and conclusions for the final action are based on information in the rulemaking record, which includes the public comments and any additional data the comments may provide. This document contains our detailed responses to the relevant comments submitted.


## II. Comments and Responses

This section of the document addresses comments received related to EPA's April 2024 proposal. In part A we address comments related to the two criteria in CAA section 181(a)(5), then in part B we address comments that, if correct, would otherwise limit EPA's discretion to grant an extension. Finally, in part C we address comments related to EPA's exercise of the discretion afforded it under CAA section 181(a)(5).

### A.      Comments Related to the Two Criteria in CAA Section 181(a)(5)

*A.1.      Eligibility for Requesting a 1-year Extension*

A.1.a.    *Comment:* Commenter (0016) disagreed with EPA's proposal, claiming that the State of Utah's two-page request for a second 1-year extension is "deficient." According to the commenter, it is "implicit" in the CAA that a state seeking an extension "must demonstrate that any extensions are justified and consistent with the criteria" in CAA section 181(a)(5)(A) and (B). The commenter says that Utah's application, "which is only two pages long, does not demonstrate that a second extension of the attainment date is warranted." The commenter further asserts that "Utah has not certified compliance" with the State Implementation Plan (SIP), because the State only asserts "that relevant SIP submissions have been approved by EPA."

*Response:* As discussed further in part C below, EPA agrees with the commenter's assertion that we should not grant an extension for the area. But we disagree with the reasoning of this comment. The State's request was not inherently deficient. First, the plain text of the statute requires only an "application" by the State. The commenter cites no case law or other authority for the claim that it is "implicit" in the CAA that this application must include any sort of demonstration. To the extent the commenter is asserting that a two-page application is necessarily insufficient, we disagree. EPA is entitled to rely on a state's certification that it has met the requirements to obtain an extension: "EPA's presumptive reliance on state certification is reasonable because it is an efficient allocation of the agency's limited resources and personnel…, and because EPA retains discretion to look beyond the certification if other evidence gives it reason to doubt the certification's credibility." *Delaware Dept. of Nat. Resources and Envtl. Control v. EPA*, 895 F.3d 90, 101 (D.C. Cir. 2018). The commenter asserts that in this case Utah did not "certify" that it had met all the requirements, because the State specifically mentioned only that EPA had approved what the commenter characterizes as "relevant SIP submissions," and did not actually assert that it is complying with the SIP. But the commenter ignores the statement in Utah's letter that it had "met both CAA requirements." That constitutes a sufficient certification of compliance for EPA's purposes – neither the statute nor the case law requires that the word "certify" be included. And, consistent with the framework laid out in *Delaware*, EPA has reasonably relied on Utah's statement of compliance with its SIP.

A.1.b.   *Comment:* Commenter (0013) supported EPA's proposal to grant the extension, stating that "the Uinta Basin meets all statutory and discretionary criteria." The commenter provided summaries of air quality and snowfall data in the Basin showing a downward trend in ozone DV over the past decade. The commenter also discussed multiple efforts that require operators to install controls and reduced emissions as required elements of the Uintah and Ouray Oil and Natural Gas Federal Implementation Plan (U&O FIP), the new 40 CFR part 60, subpart OOOOb/c rules, and the Bureau of Land Management's recently finalized Waste Prevention rule. They also highlighted the voluntary measures that operators continue to use in the Basin.

*Response:* EPA agrees with the commenter that the area met the two minimum statutory criteria for an extension. But as explained in the *Final Rule* and elsewhere in this document, we have decided not to grant the extension as proposed. EPA is not obligated to grant an extension even if the two statutory criteria are met. The statute does not specify "discretionary criteria" for this evaluation, but in the *Final Rule* preamble and part C of this document we have explained the reasoning for our discretionary decision not to grant the requested extension.

A.2.    *Compliance with State Implementation Plan*

A.2.a.   *Comment:* Commenter (0016) disagreed with EPA's proposal, claiming that the State is violating its SIP by allowing companies to claim an exemption to new source review (NSR) permitting under the Utah SIP using a non-SIP rule, and therefore that an extension is not available under section 181(a)(5).

*Response*: As discussed further in part C below, EPA agrees with the commenter's assertion that we should not grant an extension for the area. But we disagree with the reasoning of this comment. Specifically, EPA disagrees with the commenter's assertions of noncompliance with the SIP.

As the commenter explains, Utah rule R307-401-10 has been approved by EPA and incorporated into the Utah SIP. This provision exempts well sites as defined in 40 CFR 60.5430a. While this SIP-approved rule does reference R307-505 for the process for exempt sources to register with the State, EPA disagrees that R307-505 must be SIP-approved for the State to be in compliance with the SIP. The SIP-based exemption at R307-401-10(5) does not rely on the registration requirement at R307-505, and that non-SIP-approved registration requirement operates to narrow the window of availability for the exemption contained in SIP-approved R307-401-10(5). Thus, the only effect of the state-only registration process is to strengthen the SIP. And as a general matter the State may choose to limit the availability of a SIP-approved exemption by layering an additional state-only requirement onto it.

Likewise, the commenter's statement that it is "problematic" that there are other state-only rules applicable to oil and gas sources (at R307-506 through R307-510) is not justified. States may choose to add requirements that are not contained in the SIP. Even to the extent they are reflected in the R307-505 registration requirement, the cited additional requirements at R307-506 through R307-510 do not increase the scope of the exemption that is available under R307-401-10(5).

Finally, the commenter asserts that EPA has not made a CAA section 110(l) analysis of whether the registration requirements interfere with attainment or maintenance of the NAAQS. Such an analysis would be appropriate in approving a SIP submittal; to the extent the commenter contends that EPA should not have approved the SIP submittal containing R307-401-10(5),[3] the time for comment and review of that approval has passed, and the second attainment date extension request is not an available vehicle to challenge the substance of the underlying SIP rules. Instead, the valid question for the extension is whether the State is in compliance with its SIP requirements, and the commenter has identified no SIP provision that the use of a permit exemption under R307-401-10(5) conflicts with.

A.2.b.    *Comment:* Commenter (0016) disagreed with EPA's proposal, asserting that Utah is failing to comply with its SIP requirement that approval orders be "enforceable," including enforceable as a practical matter. According to the commenter, by issuing approval orders without (numeric) emission limitations, but instead "that only contain production or operational limitations," the State is issuing permits "without actual emission limitations" that as a result "are not enforceable as a practical matter." The commenter cites and describes four specific approval orders that it characterizes as "examples where Utah permitted new or modified sources of

---

[3] See Approval and Promulgation of Implementation Plans; State of Utah; Revisions to Utah Administrative Code: Environmental Quality; Title R307; Air Quality (87 FR 54898, 54899 Table 1, Sep. 8, 2022).

ozone precursor emissions after the region was designated nonattainment yet failed to properly include any emission limitations to ensure the enforceability of the limits." The commenter further asserts that EPA has stated that permits must not only "contain a production or operational limitation," but also "an emission limitation in cases where the emission limitation does not reflect the maximum emissions of the source operating at full design capacity without pollution control equipment."

*Response:* As discussed further in part C below, EPA agrees with the commenter's assertion that we should not grant an extension for the area. But we disagree with the reasoning of this comment. First, non-numeric limitations are clearly envisioned under the CAA. An emission limitation is "a requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and *any design, equipment, work practice or operational standard* promulgated under this Act." 42 U.S.C. § 302(k) (emphasis added). Thus, to the extent the commenter is implying that only numeric limits are consistent with the CAA, that is incorrect. Further, non-numeric limits are not inherently unenforceable; EPA can, and does, take enforcement actions based on failures to comply with work practice standards, operational standards, and other non-numeric forms of emission limitations. [4] Finally, to the extent the commenter is asserting that approval orders that do not contain numeric emission limits for volatile organic compounds (VOC) or other pollutants mean that the State is not complying with its SIP, we disagree. Under the approved SIP the State has issued approval orders to oil and gas sources which contain substantive requirements relying largely on specified federal New Source Performance Standards (NSPS) and Maximum Achievable Control Technology (MACT) standards. Where they are applicable to the facilities, those standards are enforceable, and there is no separate requirement that all minor source permits issued in the State contain numeric emission limits for all criteria pollutants.

**B.      Comments that Would Otherwise Limit EPA's Discretion**

*B.1.      Multi-Jurisdictional Nonattainment Area*

B.1.a.      *Comment:* Commenter (0017) opposes EPA's proposal, claiming that "EPA's application of CAA section 181(a)(5) to the dual jurisdictions governing the Uinta Basin appears improper." The commenter asserts that CAA section 181(a)(5) applies only to states, and that "despite the ruling in *Delaware Dept. of Nat. Resources and Envtl. Control v. EPA*, it appears improper to allow Utah's request for a 1-year extension to impact all or the Indian Country portion of the Uinta Basin Nonattainment Area (NAA) under EPA jurisdiction, particularly when a majority of the relevant emissions originate in this Indian Country." The commenter claims that EPA is not authorized to request an extension of the attainment date and should not be allowed to do so

---

[4] For example, see EPA's July 2, 2024 Notice of Violation to Suncor Energy Inc., in which EPA alleges failure "to operate and maintain the source consistent with good air pollution control practices for minimizing emissions," https://www.epa.gov/system/files/documents/2024-07/redacted-7-2-2024-suncor-notice-of-violation.pdf, par. 224.

"by proxy, simply by virtue of Utah's request," and that it is "improper for EPA to have the discretion to grant itself an extension of the attainment date."

*Response:* As discussed further in part C below, EPA agrees with the commenter's assertion that we should not grant an extension for the area. But we disagree with the reasoning of this comment. CAA section 181(a)(5) lays out the criteria that must be met to be eligible to request up to two 1-year extensions. Section 181(a)(5) does not exclude from its scope nonattainment areas that include Indian country. And as the court found in the Delaware decision the commenter cites, under the plain language of the CAA, "a single state can validly apply for an extension*." Del. Dep't of Natural Res. & Envtl. Control v. EPA*, 895 F.3d 90, 99 (D.C. Cir. 2018). Indian country portions of nonattainment areas were not at issue in that decision, which involved a nonattainment area encompassing parts of several states. But the logic of *Delaware* applies nonetheless, particularly because Section 181(a)(5) does not exclude Indian country from its scope. Also, nothing in the CAA indicates that the percentage of emissions within each jurisdiction that contribute to an area's nonattainment govern whether a single state can request an extension on behalf of an entire nonattainment area. Therefore, in light of *Delaware* and the plain language of the Act, we do not agree that Utah was ineligible to request an extension for the area.

The commenter also argues that by granting the extension request here the EPA would "by proxy" be requesting and granting itself an extension of the relevant CAA deadlines. But this misunderstands *Delaware* and the plain language of the Act. Under *Delaware*, "a single state can validly apply for an extension." 895 F.3d at 99.  There is no basis in the plain language of the CAA to treat extension requests differently based on EPA's potential involvement in issuing a Federal Implementation Plan (FIP). Although not specifically addressed by the court, the potential for EPA to issue a FIP for part of the area existed in *Delaware* too, since one of the states involved could have failed to submit a SIP and thus triggered EPA's FIP authority under CAA section 110(c).

## C.    Comments Related to EPA's Exercise of Discretion

In the proposed rule, we explained that the information presented by the State showed that the area met the two necessary statutory criteria for a second 1-year extension under CAA section 181(a)(5). As explained in this document, that is still our conclusion. But "section 181(a)(5) makes clear that the Administrator may exercise reasoned discretion to deny a request for a 1-year extension even where the statutory criteria for an extension are met." 87 FR 21825, 21830. In this case, as explained below and in the Final Rule, EPA is exercising its discretion to deny the request for a second extension. This section addresses comments related to EPA's exercise of discretion concerning the request.

The proposed rule stated that EPA had "found no compelling countervailing facts or circumstances that would cause the agency to exercise its discretion to deny the request notwithstanding the State's demonstration." As discussed below, in several cases commenters have provided additional information and raised additional considerations that we have considered in determining to deny the request for an extension.

C.1.    *Regional air quality*

C.1.a.    *Comment*: Commenter (0016) opposes EPA's proposal, stating that "the agency does not appear to have considered the actual and complete nature of the situation" concerning air quality in the Uinta Basin, including the high ozone levels recorded in 2023. Based on the commenter's assessment of data from 2014-2023, the commenter asserts that EPA is making an "unfounded assumption that air quality has improved in the Uinta Basin." The commenter characterizes 2022, which saw no 2015 ozone NAAQS exceedances in the Basin, as "anomalous," and notes that "[t]he 2023 ozone season was so bad that each monitor in the Uinta Basin recorded dozens of exceedances of the NAAQS." The commenter states: "[f]ar from 'one or two bad days,' the 2023 data shows that ozone levels exceeded the NAAQS on more than 30 days, including virtually the entire month of February. In Duchesne County, 33 exceedances of the NAAQS were recorded and 36 were recorded in Uintah County."

Another commenter (0017) makes similar statements, referring to "alarmingly elevated levels of ozone recorded in 2023 and over the previous decade," and stating that "for up to 30 days, 8-hour ozone concentrations in the Uinta Basin NAA exceeded the 2015 standard, topping out at an alarming 119 parts per billion (ppb)." This commenter asserts that the proposed extension would not be based on an identifiable trend toward cleaner air, documented reductions in the emissions of ozone precursors or enforceable controls shown to achieve attainment.

*Response*: For the reasons stated in the *Final Rule* and this *Response to Comments*, we agree with the commenters' general point that EPA should not grant the second extension. We do not necessarily agree with each of the commenters' characterizations of air quality in the Uinta Basin, but, overall, after reevaluating the air quality data, emissions trends, and meteorological conditions for the area, we generally agree with these commenters as to the significance of the 2023 ozone levels, and how they should affect EPA's exercise of discretion here.

The form of the primary and secondary ozone standard is based on the annual 4th-highest daily maximum 8-hour average concentration, averaged over three years. Figure 2 shows the annual 4th maximum value for each regulatory monitor in the NAA. As can be seen, there is certainly significant annual variability in ozone concentrations in the Uinta Basin area, with 2023 being a particularly high ozone year at all monitors. And while we think there is reason to believe that the efforts by Federal, State, Tribal, industry, and other partners to control emissions from the oil and gas sector are having positive impacts on monitored air quality, the high ozone levels in 2023 do indicate that ozone in the area is highly variable, and that unhealthy levels remain possible. Table 2 presents certified data from EPA's Air Quality System.[5] Based on this data, EPA can confirm that there were 29 days that exceeded the ozone standard in 2023 in Duchesne

---

[5] EPA's Air Quality System is a repository of ambient air quality data that assists in air quality assessments, designations, modeling for permit review and prepare reports for Congress as mandated by the Clean Air Act (https://www.epa.gov/aqs). Two Ute Tribal sites (Ouray and Whiterocks) and the Dinosaur NM site were considered non-regulatory from their inception in 2008 through most of 2014 (parts of 2013 and 2014 had regulatory data) while a quality assurance plan was being approved. Because of this, data from these monitors is still deemed appropriate to include for purposes of evaluating ozone trends in the Basin.

County and 33 days in Uintah County, with the highest exceedance value being 0.119 parts per million (ppm) (119 ppb). Accordingly, although the comments contained some incorrect information as to the number of days with exceedances, we agree with the general point that the number as well as the level of exceedances in 2023 was significant and raise concerns about continued attainment of the NAAQS. We have concluded that the CAA's requirements for attainment planning are necessary to ensure expeditious attainment of the NAAQS and continued maintenance of that standard, in order to protect human health and the environment in this area.

**Figure 1 – 3-Year Design Values for All Regulatory Monitors in the Uinta Basin Nonattainment Area[6]**



**Figure 2 – Annual 4th Maximum Daily 8-hour Average Values for All Regulatory Monitors in the Uinta Basin[7]**



---

[6] *See* footnote #5
[7] *See* footnote #6.

**Table 2 – Ozone Exceedances in Uinta Basin Nonattainment Area in 2023**

| | Duchesne County, UT | | Uintah County, UT | | | | |
|---|---|---|---|---|---|---|---|
| Site ID | 490130002 | 490137011 | 490471002 | 490477022 | 490471004 | 490472002 | 490472003 |
| Parameter Occurrence Code | 1 | 2 | 1 | 1 | 1 | 1 | 1 |
| Total # of Days Exceeding 0.0709 ppm in 2023 | 23 | 28 | 29 | 33 | 13 | 12 | 10 | 27 |
| 2023 Max Annual Exceedance (ppm) | 0.112 | 0.117 | 0.119 | 0.119 | 0.105 | 0.101 | 0.105 | 0.102 |

The goal of part D of the CAA, which governs planning requirements for nonattainment areas, and the responsibility of states and the EPA under that part of the Act, is to protect public health by driving progress in nonattainment areas toward attainment of the NAAQS as expeditiously as practicable and no later than the attainment dates prescribed by the Act. It is reasonable, in exercising its discretion under section 181(a)(5), for the EPA to consider what current and recent air quality data indicate about the likelihood of attaining the NAAQS, what the impact of EPA's decision would be on air quality in the area, and in turn how that would affect the existing public health burden in the area. In our proposal to grant the second extension, we acknowledged that the region experienced excessively high ozone values in early 2023, but explained that the high ozone levels that year were not determinative with respect to the decision on the request for a second extension of the attainment date:

> EPA acknowledges that preliminary ozone monitoring data indicate that in early 2023, the region experienced excessively high ozone values. While this data was not determinative in proposing to grant the 2nd extended attainment date, it does show that there continue to be periods of high ozone levels in the Basin. Addressing the continuing ozone problem will require continued efforts and steady commitments from state, local, federal, tribal, and industry partners to reduce precursor emissions in the region.[8]

We further described several sources of "reductions EPA expects will significantly mitigate exceedances in the area" including: the U&O FIP, voluntary emission reduction measures, and EPA's national rulemaking on Oil and Gas New Standards and Emissions Guidelines (OOOOb/c).

In response to these commenters, we have re-examined air quality data, emissions information, and meteorological conditions in the Uinta Basin. The high ozone levels in the Uinta Basin in 2019 and 2023 were likely due to considerably higher than average snowfall during these two years (see figure 3). In evaluating snowfall in the Uinta Basin over the past 50 years, 2019 and 2023 had the highest snowfall depths over this 50 year period. These two years also saw annual 4th maximum 8-hour ozone values nearing 100 ppb. The primary meteorological variable correlating to the formation of wintertime ozone in the Uinta Basin is the amount of snowfall and the duration of snow cover on the ground and the strength and persistence of cold air pool inversions that are associated with snow cover. In the Uinta Basin, winter ozone formation is

---

[8] *See* 89 FR at 25225.

caused by emissions of VOC and nitrogen oxides ($NO_x$) reacting in the presence of sunlight and widespread snow cover during temperature inversion conditions to form ground-level ozone. The years with the highest design values (DV) at each regulatory monitor can be correlated with the meteorological conditions conducive to strong inversions with deep and persistent snow cover being present.[9] The unique meteorological and topographic features in the Uinta Basin result in strong and persistent temperature inversions forming over snow covered ground and elevated terrain surrounding a low basin. The stable atmosphere allows emissions to accumulate and react with sunlight, but prevents the emissions from escaping the temperature inversion layer and dispersing, which allows ozone to form.[10] Conversely, in years without these conducive meteorological conditions, local anthropogenic emissions will not create high wintertime ozone concentrations. Additionally, preliminary data from 2024 supports the conclusion that high ozone levels in 2023 were affected by high snowfall that year. In January to March 2024, there was a limited amount of snowfall, which correlates with a 4th maximum ozone value of 50 ppb during this time, compared to a 4th max of 98 ppb in January to March 2023.[11]

**Figure 3 – Snowfall in the Uinta Basin Vver the Last 50 Years at Vernal, Roosevelt, and Dinosaur National Monument[12]**



On reviewing the exceedance data for 2023 and considering the comments related to this year, we conclude that the 2023 data demonstrates that when emissions are at levels present in 2023 and conducive meteorological conditions (including both strong inversions and snow cover) are present, it will lead to unhealthy levels of ozone in the Basin. And while we are encouraged by ongoing and future efforts to reduce emissions that contribute to the formation of ozone, as

---

[9] The term design value (DV) is commonly used to refer to the metric for the standard, and is the statistic that describes the air quality of a given location in terms of the indicator, form and averaging time of the standard such that it can then be compared to the level of the standard.

[10] See Regulatory Impact Analysis (RIA) for the U&O O&NG FIP for a more detailed discussion of winter ozone. This can be viewed in Docket ID No. EPA–R08–OAR–2015–0709 at https://regulations.gov/document/EPA-R08-OAR-2015-0709-0260.

[11] EPA, Outdoor Air Quality Data, https://www.epa.gov/outdoor-air-quality-data.

[12] Source: Western Regional Climate Center; sites 429111 (Vernal, UT),427395 (Roosevelt, UT), and 422173 (Dinosaur NM), https://wrcc.dri.edu/.

discussed elsewhere in this *Response to Comments*, and we expect in particular that the substantial emission reductions from full implementation of the U&O FIP will bring about air quality improvements, we do not have data or other technical information to support a conclusion that those improvements will be enough to end ozone exceedances such as those that the area experienced in 2023.

Without attainment planning, as will be required under CAA section 182(b) for areas classified as Moderate, we cannot be sure that the reductions from recent, ongoing, and planned near-term efforts will be enough to ensure that exceedances will not continue to occur, especially in years that have high snowfall. While the year 2023 may have been at the upper end of levels seen in recent years in terms of the amount of snowfall and the number of days with snow on the ground, snowfall itself is not atypical. It is not, for instance, considered an exceptional event under EPA's Exceptional Event Rule.[13] Additionally, the Clean Air Act recognized that anthropogenic emissions may only lead to high pollution levels under certain conducive meteorological conditions, and for this reason explicitly excludes strong atmospheric inversions, such as the conditions that result from heavy snow cover in the Uinta Basin, from qualifying as exceptional events. See CAA section 319(b)(1)(B)(i). Therefore, air quality planning (including an attainment demonstration) should be performed, and should take the possibility of wintertime snowfall into consideration, so that the agencies can determine the level of emission reductions necessary to attain the standard in this area even in years with meteorological conditions conducive to ozone formation.

C.1.b.   *Comment:* Commenter (0017) opposed EPA's proposal, claiming that the proposed extension would not be based on an identifiable trend toward cleaner air, documented reductions in the emissions of ozone precursors or enforceable controls shown to achieve attainment.

*Response:* For the reasons stated in the *Final Rule* and this *Response to Comments*, we agree with the commenters' general point that EPA should not grant the second extension. As to the comment's reference to "enforceable controls shown to achieve attainment," we agree that due to the area's classification as Marginal, the area has been exempt from the CAA nonattainment requirement to have an attainment plan that demonstrates attainment of the NAAQS. *See* CAA section 182(a) ("The requirements of [the Marginal classification] shall apply in lieu of any requirement that the State submit a demonstration that the applicable implementation plan provides for attainment of the ozone standard by the applicable attainment date in any Marginal Area."). And as discussed above, comments received on the lack of an attainment demonstration SIP in the Basin, and the associated enforcement mechanisms that come with an approved SIP, are among the reasons EPA is denying the extension. EPA disagrees, with the implication that documented and enforceable reductions in emissions of ozone precursors are requisite for states to qualify for a 1-year extension of the attainment date, but we agree that under these factual

---

[13] *See* Final Rule, Treatment of Data Influenced by Exceptional Events, (81 FR 68216, Oct. 3, 2016), and *see* EPA's Best Practices for Preparation of Multi-Agency Exceptional Events Demonstrations, April 12, 2017, https://www.epa.gov/sites/default/files/2017-06/documents/best_practices_multi_air-agency_ee_demos_final.pdf.

circumstances, commenters have raised a legitimate concern that expeditious attainment of the NAAQS may not be served by granting an extension. Denying the extension request will result in reclassification to Moderate, which will require an attainment demonstration to be developed, among other CAA requirements. Application of those requirements includes development of an attainment demonstration that will allow the agencies involved to accurately assess whether controls EPA identified within our proposal will result in timely and continued attainment of the NAAQS, or whether additional controls are required.

C.1.c.    *Comment:* Commenter (0017) disagreed with EPA's proposal to determine that the area attained by the attainment date, stating that EPA should not use 2020-2022 data, and that monitored values for 2020 and 2021 are not characteristic of concentrations in the NAA, because oil and gas development in the Uinta Basin, and therefore emissions from this activity, were uncharacteristically low due to the pandemic. The commenter stated that EPA's planned action does not demonstrate that ozone concentrations in the Uinta Basin will remain low based on concrete emission reductions or air quality trends that showed consistent progress toward attainment. The commenter further states that they believe that attainment is based on a DV that no longer includes 2019, when the relevant monitored value for the Basin was 98 ppb. They claim that EPA's argument for a finding of attainment based on a DV for the years 2020-2022 is contrary to the CAA's goal of protecting public health and instead relies on serendipity.

*Response:* For the reasons stated in the *Final Rule* and this *Response to Comments*, we agree with the commenters' general point that EPA should not grant the second extension. As to the comment's assertion that "EPA's argument for a finding of attainment based on DVs from the years 2020-2022 is contrary to the CAA's goal of protecting public health and instead relies on serendipity," we note that the CAA mandates the specific years that are to be used in determining whether an area attained. CAA section 181(b)(2)(A) requires that the EPA determine whether an area attained by the attainment date "based on the area's DV (as of the attainment date)."[14] The DV, as defined and explained in 40 CFR part 50, Appendix U, refers to the metric that is used to compare ambient ozone concentration data measured at a site in order to determine compliance with the NAAQS. Per 40 CFR 50.19, the 2015 ozone NAAQS is met when the 3-year DV is less than or equal to 70 ppb (i.e., 0.070 ppm). In addition, as discussed in the *Final Rule* and this *Response to Comments*, under the CAA and EPA's regulations, the Uinta Basin's DV for the relevant time period in the proposed rule (i.e., the 2020-2022 DV, for an attainment date in 2023) showed that the NAAQS would be met, were EPA to grant the extension.

However, in this final action, EPA is denying the request for an extension after close examination of factors impacting air quality in the Uinta Basin. We have determined that there is uncertainty about whether the current and expected level of controls will be sufficient to achieve continued

---

[14] *See* 87 FR 60902.

attainment in the area, and that granting the extension could result in impeding expeditious and continued attainment of the NAAQS, rather than progress towards that goal.

C.1.d.    *Comment:* Commenter (0016) opposes EPA's proposal because they claim that EPA only looked at 2 of 7 monitors in the NAA. The commenter claimed that "Although EPA may have discretion to review monitoring data beyond that referenced and/or submitted by a state, in this case the agency has relied on Utah's submission to conclude that monitoring data justifies an extension of the attainment date."

*Response:* EPA disagrees with the commenter's assertion that the agency only looked at two of seven monitors in the region. As discussed and shown in table 2 of the proposed action, all seven regulatory monitors were evaluated as part of the determination on whether to grant the extension. This includes two monitors operated by the State of Utah, four monitors operated by the Ute Indian Tribe, and one monitor operated by the U.S. National Park Service.

*C.2.    Planning Requirements*

C.2.a.    *Comment:* Commenters (0016) and (0017) oppose EPA's proposal, claiming that "EPA and Utah will be off the hook for developing enforceable plans" and "it will literally put the Uinta Basin in clean air purgatory." The commenters claim that there will be no deadlines for attaining the NAAQS, no requirement that any additional rules or plans be adopted to further curtail ozone, and no consequences for any ongoing failure to attain.

*Response:* EPA does not disagree with the commenters that the area would remain in a type of "purgatory," in the sense of being in a state without a clear resolution in the near term.[15] If the extension is granted, the area would remain a Marginal nonattainment area, which would still be subject to CAA air quality protection requirements, including a 100 tons per year (tpy) major source threshold, 1.1:1 NSR offsets, and submittal of periodic emissions inventories, but the State of Utah would not be required to implement tighter controls or contingency measures under CAA section 182 based on violating air quality data, nor would the area be subject to future attainment dates. The EPA does maintain the ability to implement FIPs on Indian country, though. The most recent plan, the U&O FIP, was finalized in 2022, has begun to achieve timely reductions from sources on Indian country lands within the Uinta Basin, and will continue to do so. The implementation deadline under the U&O FIP was February 6, 2024, with the first triennial emissions inventory deadline in 2024.

As one commenter (0017) highlights, a majority of emissions in the NAA are from sources on Indian country lands. Accordingly, EPA expects the existing U&O FIP to result in significant air quality improvements in the nonattainment area. Moreover, the EPA has the authority and obligation to issue additional FIP requirements or update the U&O FIP, if doing so is necessary or appropriate to protect air quality.[16] EPA continues to monitor the effectiveness of current

---

[15] The phrases "off the hook" and "clean air purgatory" do not have specific meaning under the Clean Air Act and EPA regulations, and we would disagree with some possible interpretations of those phrases.
[16] *See* 40 CFR 49.11(a); *see also* CAA section 301(d).

regulations, including the U&O FIP, to evaluate whether more requirements need to be applied to sources in the NAA. Additionally, the State of Utah is continuing to explore new rules to reduce emissions from oil and gas, independent of planning obligations under subpart 2 of the CAA. Furthermore, with the finalization of EPA's Emission Guidelines for Greenhouse Gas Emissions from Existing Crude Oil and Natural Gas Facilities, also known as subpart OOOOc, the State of Utah is in the process of developing a plan to comply with these new regulations.[17]

While EPA believes these ongoing efforts by the State and through the implementation the U&O FIP will result in meaningful emission reductions in the Uinta Basin, commenters highlighted the effect that granting the extension would have on EPA's ability to determine whether further measures would be necessary to ensure sustained attainment in the area. Therefore, and as discussed above in response to other comments, we agree with the substance of the commenters' concern that granting the extension would place the area in a legal status that could ultimately impede timely and sustained attainment of the NAAQS.

C.2.b.    *Comment:*  One commenter (0013) stated that finalizing the *Determination of Attainment by the Attainment Date* (DAAD) does not re-designate the area to attainment, and stated that to be redesignated to attainment, the Uinta Basin must meet several additional requirements, including: EPA must determine that the improvement in air quality is due to permanent and enforceable emission reductions; EPA must fully approve a maintenance plan including contingency measures to be triggered if the area falls back out of attainment; and the initial maintenance plan must demonstrate that the area will continue to attain the standard for 10 years after EPA redesignates the area to attainment. The commenter also requested that "EPA work closely with UDAQ and the Tribe to develop and approve a maintenance plan for the Uinta Basin" to "eliminate any future uncertainty for operators and the agencies."

*Response:* EPA agrees with the commenter that the proposed DAAD would not have constituted a redesignation to attainment. The comments about the requirements for redesignation are beyond the scope of this action. We note that, as other commenters pointed out, if the area were granted the second extension and subsequent DAAD, the air quality planning and control requirements associated with Moderate nonattainment status would not take effect, even if air quality in the Basin continued to exceed the standard or otherwise worsen. In that situation, the State would also be ineligible to submit a maintenance plan until ozone levels were back under the standard, potentially leading to a situation where air quality could continue to violate the NAAQS without consequences such as mandatory reclassification, implementation of contingency measures, or required submittal of an attainment demonstration SIP. While EPA is optimistic that the area will attain the NAAQS and remain in attainment through the emission reduction efforts to date, given present information and the lack of an attainment

---

[17] A new national FIP is being developed for implementing this regulation on Indian Country where the Tribe(s) do not develop a Tribal Implementation Plan.

demonstration, we cannot be certain that this will occur. Accordingly, and as explained in the *Final Rule* and the remainder of this *Response to Comments*, we are denying the request.

C.2.c.    *Comment:*  The UDAQ commented that they intend to continue to work on regulatory strategies to address further oil and gas emission reductions that are effective and reasonable, and expressed the State's commitment to engaging industry and local stakeholders as it continues to coordinate with EPA Region 8 and the Ute Tribe on these strategies.

*Response:* EPA acknowledges this comment and appreciates the State of Utah's commitment to continued emission reductions in the nonattainment area. And while this final action is not what the State supported in their comments, we are committed to continued coordination and collaboration with the State on the development of an attainment demonstration SIP for the Basin and engage on further research efforts aimed at improving modeling and identifying control strategies.

C.3.    *Regional Oil and Gas Activity and Regulatory Efforts to Reduce Emissions*

C.3.a.    *Comment:* Commenter (0017) opposes the proposal and asserts that EPA ignores growing oil and gas production and ongoing issues and delays with environmental standards and compliance that are critical in assessing whether the area will comply with the 2015 Ozone NAAQS in future years.

*Response:* We disagree that the EPA is ignoring growing oil and gas production. We agree that the emissions associated with oil and gas production in the area contributed to continued air quality problems which is among the reasons we are denying the request for an attainment date extension.

The 2022 U&O FIP was developed in part to provide for VOC emission reductions in amounts that would more than offset the expected growth in emissions from additional oil and gas production in the area.[18] The purpose of the U&O FIP is to "ensure that [VOC] emissions reductions will be achieved that will ensure that new development ...will not interfere with attainment of the NAAQS." The compliance Under the rule, the compliance deadline for existing sources was in 2024, and based on those deadlines, EPA expects that the majority of emission reductions required by the U&O FIP to take effect before the winter 2024-25 ozone season in the Uinta Basin. In addition to the significant VOC emissions control requirements in the U&O FIP, sources in the Uinta Basin are subject to federal regulations, including EPA's revised NSPS for new and existing oil and gas sources.[19]

We expect that these regulatory requirements will lead to ongoing reductions in emissions from oil and gas operations, with resulting improvements in air quality in the nonattainment area. Additionally, EPA will be reviewing periodic emissions inventories collected under the U&O FIP,

---

[18] *See* Final Rule, Federal Implementation Plan for Managing Emissions From Oil and Natural Gas Sources on Indian Country Lands Within the Uintah and Ouray Indian Reservation in Utah, 87 FR 75334, 75337 (Dec. 8, 2022).
[19] See 40 CFR part 60, subparts OOOOb and OOOOc.

as well as evaluating other air quality data in the Basin. This ongoing review effort is meant to ensure that the U&O FIP is meeting its stated objectives of reducing emissions and identifying additional areas that may be require additional controls in the future.

Despite these efforts, we acknowledge that the U&O FIP did not include an attainment demonstration and was not designed to ensure attainment of the 2015 ozone NAAQS. Nor do EPA's revised NSPS requirements necessarily ensure attainment. Under the CAA's NAAQS framework, planning is key to ensuring that the standards are attained – particularly in an area such as the Uinta Basin, which has recently (i.e., in 2023) experienced very high ozone levels. Granting a second extension for this area would have the effect of the area remaining in Marginal nonattainment status indefinitely, without any requirement to plan for attainment should the area continue to violate the NAAQS.[20]

In EPA's view, "[t]he underlying premise of an extension is that an area already has in place a control strategy adequate to attain the ozone standard and that no additional measures are necessary." 62 FR 46229. Declining to grant the second extension of the attainment date for the area will ensure that a control strategy is developed, through the SIP process and through implementation of the EPA's Indian country air protection responsibilities under 40 CFR 49.11.

Accordingly, and for the reasons further explained in the *Final Rule* and this *Response to Comments* document, EPA is denying the second 1-year extension.

C.3.b.    *Comment:* Commenter (0013) supported EPA's proposal but urged EPA to finalize this approval as soon as possible, claiming that operators in the Uinta Basin and State regulators will remain in a state of uncertainty until finalized. The commenter stated that if EPA were to "reverse the extension approval," air quality planners would lose planning time to develop required SIP elements.

*Response:* As explained in the *Final Rule* and elsewhere in this document, we have decided not to grant the extension as proposed.

EPA agrees with the commenter that timely action is important, as is certainty for operators and regulators – we would add that certainty is important for the public and the Tribe as well. In addition to certainty, however, other concerns are relevant to this action, as discussed in the preamble to the *Final Rule* and this *Response to Comments*. In particular, along with the benefits of prompt action, EPA must consider the health and air quality concerns that are paramount in the CAA[21] and that have been raised by commenters.

With respect to the commenter's concern about developing required SIP elements, we note that as stated in the *Final Rule*, EPA will address deadlines under the new classification in a separate rulemaking that is subject to notice and comment. This action, along with the separate

---

[20] *See* 83 FR 63003 (establishing implementation requirements, including planning deadlines, for the 2015 ozone NAAQS).
[21] *See, e.g.,* 42 U.S.C. § 7401(b)(1) (listing first, among the purposes of the CAA, "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population").

rulemaking about deadlines, will give advance notice of forthcoming requirements, and some degree of certainty about those requirements, to operators, regulators, the public and Tribe. In addition, we expect that EPA will be on a similar schedule to develop planning elements for the Indian country portions of the nonattainment area, in accordance with its authority and obligation to protect air quality in Indian country.[22]

C.3.c.  *Comment:* The UDAQ commented that they supported EPA's proposal, expressing concern about the complications that would be faced by the State were the area bumped up to Moderate. The commenter stated that the Uinta Basin is a "complex multijurisdictional airshed with regulatory authority shared by UDAQ, the Ute Tribe and EPA and multiple land management agencies, creating unique challenges to meet CAA requirements." The commenter asserts that "[t]he EPA does not have to meet the same regulatory requirements or deadlines as the State of Utah," and that it "would be extremely difficult for UDAQ to meet the CAA requirements on their own with the small percentage of emissions under our [the State's] jurisdiction and facing negative consequences if unable to meet the full requirements and deadlines." Further, the UDAQ noted that, "the Uinta Basin is a remote rural area with unique topography, leading to cold weather conditions and one main sector of emission sources that are the primary contributors of ozone precursor emissions, some aspects of the CAA are not conducive to the best regulatory paths to improving and maintaining good air quality in the area. It is important to allow co-regulatory agencies to have the flexibility to continue to focus on better understanding the emission inventory, the unique chemistry of how ozone is formed in the wintertime and focusing on the most impactive emission reductions."

*Response:* EPA acknowledges the UDAQ's concerns and agrees with their view that air quality regulation in the Uinta Basin is unique. However, as explained in the *Final Rule* and elsewhere in this document, we have decided not to grant the extension and are committed to maintaining a similar schedule to the State in developing planning elements for the Indian country portions of the nonattainment area. As is our practice and consistent with the CAA framework of cooperative federalism, EPA intends to support UDAQ in its planning efforts to address the air quality needs of this area. As to EPA's responsibility, the agency has an air quality protection obligation for Indian country under CAA section 301(d) and 40 CFR 49.11(a), which persists regardless of the area's attainment status or whether an extension has been granted by the EPA.[23]

EPA also acknowledges that within the Uinta Basin, approximately a third of the ozone precursor emissions are from oil and gas sources on located State land with the other two-thirds of

---

[22] See 40 CFR 49.11(a).

[23] In accordance with its obligation to protect air quality in Indian country, the EPA has previously promulgated the U&O FIP (*see* Final Rule, Federal Implementation Plan for Managing Emissions From Oil and Natural Gas Sources on Indian Country Lands Within the Uintah and Ouray Indian Reservation in Utah, 87 Fed. Reg. 75334, 75337 (Dec. 8, 2022). The substantial emission reductions anticipated from that plan are starting to take effect this year, and we expect that they will promote attainment, but that FIP was not developed as an attainment plan, and so under the new classification further attainment planning efforts will be necessary.

precursor emission being from sources on Indian country. While this demonstrates a need to continue emission reduction efforts on Tribal land, it does not mean that there are not still emissions that can, and should, be evaluated and further controlled on State land. EPA will continue to work with the State and the Tribe to develop implementation plans that ensure air quality standards are met and that public health and the environment are protected.

C.3.d.  *Comment:* Commenter (0017) opposes EPA's proposal due to a concern about increased truck traffic due to oil and gas activity. The commenter brings up the Uinta Basin Railway and states that "Utah's oil industry has been working on loadout facility expansion projects that would allow for a big increase in trucking traffic in the area and increase export capacity nearly to the level the rail project would have been able to accommodate, with significant negative air-quality impacts."

*Response:* EPA acknowledges that oil and gas activity can contribute to air pollution and is a focus of many local and national efforts to reduce emissions from this sector. However, having oil and gas activity in a NAA does not disqualify a region from requesting an attainment date extension if the area meets all criteria for such a request.

C.3.e.  *Comment:* Commenter (0017) opposed EPA's proposal due to enforcement actions uncovering violations of regulations in the Basin. The commenter stated that, "UDAQ's 2022 Air Quality Annual Report notes that it conducted joint inspections with EPA "of numerous oil and gas facilities in the Uinta Basin finding violations of environmental laws. These violations resulted in UDAQ and EPA issuing joint notices of violations against the companies and ultimately settling the cases in 2022."

*Response:* EPA is concerned about CAA violations in the Basin and acknowledges EPA and State enforcement efforts in the area. Violations can contribute to excessive emissions in the Uinta Basin, and enforcement is an important component of air quality regulations. The fact that violations were discovered is an example of effective enforcement, which we expect to lead to higher compliance rates and lower emissions.

C.3.f.  *Comment:* Commenter (0017) opposes EPA's proposal due to a claim that the U&O FIP reductions are unproven. The commenter states, "there is nothing in the record to suggest that any emission reductions from the U&O FIP will be sufficient to counter the significant increase in production in the Uinta Basin." They also complain that "elevated ozone levels from 2023, increased production and significant development pressure indicate that reliance on the U&O FIP alone or in tandem with other measures is not enough to warrant granting the extension, finding attainment, and forgoing the obligations otherwise required by a Moderate SIP.

*Response:* EPA agrees with the commenter's assertion that we should not grant an extension for the area. But we disagree with the reasoning of this comment.

EPA disagrees with the commenter that the efficacy of the U&O FIP must be proven in order to grant the extension or determine that the area attained by the attainment date. This is not a

required criterion for either of the proposed actions, and relying on such a demonstration would only further delay EPA in fulfilling its CAA-mandated obligation to determine whether an area attained by its attainment date. Further, in promulgating the U&O FIP EPA already concluded, based on an extensive record including public comments, that reductions from the FIP would more than make up for emissions from expected production increases:

> … development of new and modified true minor oil and natural gas sources would need to occur at over 90 times the current pace of development to consume the annual headroom that full compliance with this FIP is expected to generate. With this reevaluation, we continue to support the conclusion that the reductions achieved by this FIP will create more than enough headroom for the current or higher rates of development for years to come while first and foremost improving ozone air quality. We plan to periodically reevaluate our assumptions in the future based on changes in the pace of development and may take additional actions to protect air quality as necessary or appropriate.[24]

EPA maintains the ability to expand the requirements of the U&O FIP in the future if data suggests more reductions are needed to keep the region in attainment.

C.3.g.  *Comment:* Commenter (0017) expressed concern with the finalized methane rules (see 89 FR 16820, Mar. 8, 2024), claiming that there is nothing in the record to suggest that any emission reductions from the rule will be sufficient to counter the significant increase in production in the Uinta Basin. They claim that under the new rule, standards for existing sources will take years to come "in effect." Specifically, they claim that under the methane emissions standards, states have two years to submit their proposal to EPA and EPA has up to one year to complete its review. If EPA rejects a state's submission, EPA must then propose and finalize a federal existing source standard for that state. Thus, it could take four to five years or more before every state standard is in effect. And this timeline does not account for the potential of protracted litigation over EPA's decision to grant or deny a state submission or a subsequent federal standard.

*Response:* EPA disagrees with the commenter that the efficacy of the recently implemented OOOOb/c must be proven in order to grant the extension or determine that the area attained by the attainment date. These are not required criteria for either of the proposed actions, and relying on such a demonstration would only further delay EPA in fulfilling its CAA-mandated obligation to determine whether an area attained by its attainment date.

C.4.  *Environmental Justice*

In the proposed rule, we explained that we had considered specific information related to environmental justice, and we proposed to find that that information "[did] not weigh against our proposal to grant the request." The information considered consisted of an EJScreen analysis for Duchesne and Uintah Counties, which encompass the entire Uinta Basin nonattainment area,

---

[24] 87 FR at 75363 (footnote omitted).

along with the ozone design values for the area. 89 FR at 25227-25228, 25288 n. 24. As discussed below, commenters have raised additional concerns and provided additional information in this area.

C.4.a.   *Comment:* Commenter (0017) opposes an extension of the attainment date, and states that EPA did not adequately evaluate Environmental Justice (EJ) and how the proposed actions might adversely impact pollution-burdened, underserved, and Tribal communities, or how any impact might be avoided, minimized or mitigated. The commenter claims that it is up to EPA to also consider any statewide environmental disparities and to provide just treatment to which these individuals and communities are entitled. They claim that EPA did not indicate disproportionate exposure or burdens with respect to non-ozone environmental indicators and that EPA did not explain why it did not consider the EJ ozone index, which the commenter claimed was "the very index that is most germane to the proposed extension." They also claimed that the EJScreen data demonstrate that the people of Duchesne and Uintah counties, including those living the closest to the sources of ozone pollution, are being disproportionately impacted by ozone pollution and, as a result, are suffering disproportionately adverse human health and environmental effects and risks and that it underscores that communities in the Uinta Basin NAA are disproportionately impacted by ozone to the degree that EPA's failure to admit, consider and address these disparities conflicts with the agency's obligation to justly treat and protect the health and well-being of these communities. The commenter also claims that the record makes clear that EPA has not taken "immediate and affirmative steps to incorporate EJ considerations into their work, including assessing impacts to pollution-burdened, underserved and Tribal communities in regulatory development processes and considering regulatory options to maximize benefits to these communities."

*Response*: EPA disagrees with the commenter's contention that the EPA did not adequately evaluate EJ as part of its proposed action on Utah's request for a second one-year extension of the attainment date. We note that we are denying the State's request in this action.

As commenters point out, the EJScreen tool is useful as an initial indicator of whether the EPA should conduct further review to understand whether, within a screened area, there are communities with potential equity or EJ concerns that may be experiencing disproportionate ozone or other pollution burdens. More specifically, to calculate a specific EJ Index, EJScreen uses a formula to combine a single environmental factor, such as ozone, with the demographic index that averages low-income populations and populations of people of color within the screened area. The Supplemental Indexes use the same EJScreen methodology but incorporate a five-factor supplemental demographic index that averages percentages of low-income persons, persons with disabilities, limited English proficiency, less than high school education, and low life

expectancy. Thus, the EJScreen EJ Indexes and Supplemental Indexes inform the EPA's evaluation of whether to conduct further review of potential disproportionate burdens on communities and explore whether the agency has any authority within the action to address EJ concerns within the respective area being evaluated.

EPA followed a process here that is consistent with the EJ evaluation EPA conducted for the first 1-year extension. As discussed in the proposal, as part of the screening analysis to evaluate whether communities in the Uinta Basin area could be exposed to disproportionate pollution burdens as a result of the proposed grant of the extension request, we used EJScreen version 2.2. An updated version of the tool came out in June 2024 and the administrative record includes the EJScreen version 2.3 reports for Uintah and Duchesne Counties that EPA used in developing this final action.

Beyond EJScreen, we examined ozone DV data for the Uinta Basin area, which in accordance with footnote 24 of the proposal we consider an "informative indicator of pollution burden from ozone in the Uinta Basin area." The DV metric's longer time frame (3 years, as compared to 1-year time frames within EJScreen), provides a more comprehensive understanding of overall ozone conditions, including the consideration that ozone-related health burdens can develop and worsen over multiple years of exposure. The shorter-term dataset utilized for the EJScreen ozone indicator is one reason the EPA relies more heavily on the DV metric to understand ozone burdens in a screened area when assessing EJ considerations in our evaluation of requests for extensions of attainment dates in a given nonattainment area. But the EJScreen information retains relevance in this analysis, particularly with respect to understanding the socioeconomics of surrounding communities and the existing distribution of environmental and health burdens.

With respect to Tribal communities, we acknowledge that the Tribe also requested the extension. Our responsibilities to consider the health effects of this action on individual Tribal members are separate, however, from our goals and responsibilities with respect to the Tribe as a sovereign nation. And as is the case with other persons in the nonattainment area, concerns about ozone-related health impacts on Tribal members in the area are part of the basis for our decision to deny the request for an extension of the attainment date.

C.4.b.   *Comment:* Commenter (0013) disagreed with EPA's EJ evaluation, claiming that the criteria EPA used in its proposal are not appropriate for evaluating requests to extend ozone attainment dates. The commenter disagrees with EPA's proposal to use non-ozone environmental indicators to evaluate actions related only to ozone.

*Response:* EPA disagrees with the commenter that, in this instance, EPA's EJ evaluation was not appropriate. In this case, the statute has provided the Administrator a discretionary authority in the attainment date extension provisions. As a result, given

the circumstances of this nonattainment area, we think it is reasonable to consider all available data related to the existing environmental burden in the area in question, and what impact our action may have on that burden.

Consideration of the existing pollution burden borne by the population that will be impacted by our action is a relevant factor of reasoned decision making. Thus, as discussed in response to comment C.4, the EPA performed screening analyses to better understand the pollution burdens borne by the population that will be affected by the requested extension in order to fully understand the potential public health ramifications of the extension.

C.4.c.    *Comment*: Commenter (0017) discusses elevated asthma as depicted in the maps in Exhibit C of their comments.

*Response*: EPA acknowledges that there is a relationship between ozone and asthma, which is discussed in detail in the Ozone Regulatory Impact Analysis developed during the 2015 NAAQS review, which resulted in the tightening of the standard from 75 ppb to 70 ppb.[25] While asthma is an important health concern, its prevalence is most relevant in setting the form and the level of the ozone standard and is not data that is directly considered in determining whether an area is complying with the ozone NAAQS. But the potential impact of ozone pollution on persons with asthma is a significant concern. As the commenter notes, screening information indicates that areas within the Uinta Basin experience a higher incidence of asthma compared to other areas of the state and country.[26] Based on EPA's understanding of the relationship between ozone and asthma, we have concluded that EPA's final action is consistent with the public health protection purpose of the statute. We anticipate that the ozone precursor emission reductions that will be required by the CAA as a result of this final action and attainment of the NAAQS would have a positive impact on area asthma rates. Timely attainment of the ozone NAAQS also serves to ensure that communities in the Uinta Basin are not exposed to disproportionate health and environmental burdens. Ozone is associated with multiple negative health effects; we expect that this decision will help reduce these effects in the communities in the Uinta Basin.[27]

---

[25] EPA, Regulatory Impact Analysis of the Final Revisions to the National Ambient Air Quality Standards for Ground-Level Ozone, Sept. 2015, https://www.epa.gov/sites/default/files/2016-02/documents/20151001ria.pdf.

[26] Utilizing EJScreen 2.3, for Uintah County, the asthma health indicator is at the 94th percentile compared to the state and the 83rd percentile compared to the U.S; for Duchesne County, the asthma health indicator is at the 85th percentile compared to the state and the 69th percentile compared to the U.S.

[27] *See* EPA's 'Health Effects of Ozone Pollution' at www.epa.gov/ground-level-ozone-pollution/health-effects-ozone-pollution.